UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------- X

KHEIRA ZAHAF, as Legal Guardian of AHMED FERHANI,

Plaintiff,

- against -

NEW YORK DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION; ANTHONY J. ANNUCCI, Acting Commissioner, New York State Department of Corrections and Community Supervision ("DOCCS"); DALE ARTUS, Superintendent, Attica Correctional Facility; STEWART T. ECKERT, Deputy of Security, Attica Correctional Facility; STEPHEN J. MAHER, Office of Special Investigations, DOCCS; JEFFERY K. SCHIFFER, Supervisor Offender Rehabilitation Coordinator; LEANNE LATONA, Deputy Superintendent of Programs, Attica Correctional Facility; MICHAEL J. DIEBEL, Corrections Officer,

Defendants.

-------------------------------------------------------------------------- X

**Docket No. 22-cv-00291**

**COMPLAINT**

**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

1.     Plaintiff Kheira Zahaf brings this civil rights action arising out of the attempted suicide of her son, Ahmed Ferhani ("Ahmed"), that resulted in Ahmed being brain damaged and unable to protect his legal rights or function in society. Ahmed was 31 years old and had been in the New York State Department of Corrections and Community Supervision's ("DOCCS") custody for approximately three years when he attempted suicide at Attica Correctional Facility ("Attica"). Plaintiff commences this suit against the DOCCS employees who condoned or participated in the cruel abuse and harassment that caused Ahmed to attempt suicide and who failed to utilize required and/or appropriate suicide prevention measures that would have prevented this tragedy.

2.      Upon his arrival into DOCCS custody, DOCCS staff knew, or should have known, from Ahmed's documented mental health history that he had serious mental health issues and was a chronic risk for suicide. Ahmed had been sexually abused as a child, struggled with substance abuse, and had a history of psychiatric hospitalizations. Prior to his incarceration with DOCCS, Ahmed had been diagnosed with several personality disorders and prescribed psychotropic medicines, which he tended to avoid. His mental health issues made him vulnerable to abuse and exploitation. Critically, Ahmed had an extensive history of self-harm, suicidal ideation, and suicide attempts. Ahmed's medical records specified that Ahmed's suicidal ideation was directly related to his experiences of depression and frustration, which were exacerbated by his incarceration. While he was held on Rikers Island, just prior to being placed into DOCCS custody, Ahmed had made several documented suicidal gestures and suicide attempts and spent a significant amount of time on suicide watch.

3.      Ahmed's DOCCS admission records also documented several protective factors that potentially mitigated Ahmed's susceptibility to self-harm and suicide. These included his loving and supportive parents, his fiancé, his Muslim religious faith, and his future orientation towards the goals and dreams which he hoped to achieve in his life. In spite of his troubled mental history and difficulties with incarceration, Ahmed was determined to better himself while in custody. In particular, Ahmed wanted to learn a useful skill or job trade while he was in prison so that he could be productive, support his parents, and start his own family with his fiancé when he was released.

4.      Instead of fostering Ahmed's mental health and desire for self-improvement, DOCCS staff sadistically engaged in conduct that encouraged his suicidality. DOCCS staff harassed, bullied, and tormented Ahmed constantly. Their conduct eventually caused Ahmed to

be fearful of ever leaving his cell. DOCCS staff also denied Ahmed access to programs through which he could better himself and develop useful skills. When Ahmed sought to be moved to a prison closer to the support of his family and fiancé, DOCCS staff instead transferred him hundreds of miles further away to Attica, making it all but impossible for his family and fiancé to visit him. DOCCS staff additionally prevented Ahmed attending the religious classes that provided him consolation.

5.      As a result of his continual mistreatment by DOCCS staff, Ahmed gave up on life. Before acting on his suicidality, however, Ahmed made one last plea to DOCCS authorities to put a stop to the abuse that he could no longer endure. With reckless and wanton disregard of Ahmed's manifest suicidality, Defendants ignored Ahmed's pleas and allowed his abuse to continue. Defendants did not follow standard suicide prevention procedures, such as submitting Ahmed to a mental health screening or having him monitored for self-harm. He was not provided any form of mental health care whatsoever. Defendants did not at all address Ahmed's complaint of mistreatment by corrections officers, which he specifically stated would cause him to commit suicide.

6.      Predictably, the corrections officers' mistreatment of Ahmed continued, and Ahmed hanged himself. While Ahmed did not die as a result of his suicide attempt, he suffered major brain damage that has left him unable to protect his legal rights or to function in society. Had Defendants met their basic constitutional duties, Ahmed would still be able to function normally and would have been able to pursue his goals of supporting his parents and starting his own family with his fiancé. Accordingly, this Complaint seeks compensatory and punitive damages pursuant to applicable laws for the grievous harm Ahmed suffered, and continues to suffer, as a result of Defendants' unlawful acts and omissions.

## JURISDICTION

7.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution and New York state common law.

8.     Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343(a)(3) and the previously mentioned statutory and constitutional provisions.

## VENUE

9.     Venue is proper for the United States District Court for the Western District of New York pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

10.     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

11.     Ahmed Ferhani resided at Attica Correctional Facility, Wyoming County, at the time the events occurred that resulted in his being unable to protect his legal rights or function in society.

12.     Kheira Zahaf is Ahmed's mother. She is a citizen of the United States and a resident of New York. Ms. Zahaf was appointed Guardian of Ahmed on November 20, 2019.

13.     The New York State Department of Corrections and Community Supervision ("DOCCS") is a department of the State of New York with its central office in Albany, New York. DOCCS is responsible for the confinement and habitation of incarcerated individuals held in correctional facilities throughout the State. DOCCS receives federal funding. At all relevant times herein, Downstate, Great Meadows, and Attica Correctional Facilities were operated and maintained by DOCCS.

14.     At all times relevant to this Complaint, Anthony J. Annucci was Acting Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS") and acting under color of state law. As Acting Commissioner of DOCCS, Mr. Annucci is responsible for the management and control of all New York state prisons, and for all matters relating to the placement, supervision, and discipline of DOCCS' Corrections Officers, and for inmates placed in the care, custody, and control of Corrections Officers. He is responsible for implementing system-wide training in suicide prevention, including a culture of awareness on how to quickly address and respond to suicide factors. Mr. Annucci was contacted by Ahmed and was directly aware that Ahmed had mental health issues, was displaying suicidal ideation, and that there was a substantial risk that Ahmed would attempt suicide, yet he failed to take adequate steps to mitigate that substantial risk.

15.     At all times relevant to this Complaint, Dale Artus was the Superintendent of Attica Correctional Facility ("Attica"), a facility within DOCCS, who was acting under color of state law. As Superintendent of Attica, Mr. Artus was responsible for, *inter alia*, the care, custody, and control of all people confined at Attica. Mr. Artus had a duty to ensure the physical safety and wellbeing of these people and to provide them with fundamental human necessities, including medical care. He was also responsible for the creation, promulgation, implementation, and oversight of policies and programs involving the administration of on-site medical care at Attica. Mr. Artus was also responsible for the supervision of all DOCCS staff at Attica. Mr. Artus was also responsible for preventing inmate suicides at Attica by, *inter alia*, effectively monitoring inmates, understanding potential suicide indicators, and knowing the appropriate responses when it was determined that an inmate might be at risk for self-harm or suicide. Mr. Artus was aware that Ahmed had mental health

issues, was displaying suicidal ideation, and that there was a substantial risk that Ahmed would attempt suicide, yet he failed to take adequate steps to mitigate that substantial risk.

16.    At all times relevant to this Complaint, Steward T. Eckert was the Deputy of Security of Attica, within DOCCS, and acting under color of state law. As Deputy of Security at Attica, Mr. Eckert is responsible for security matters and DOCCS personnel investigations and for generating, as well as enforcing, DOCCS policies. Mr. Eckert was also responsible for preventing inmate suicides by, *inter alia*, effectively monitoring inmates, understanding potential suicide indicators, and knowing the appropriate responses when it was determined that an inmate might be at risk for self-harm or suicide. Mr. Eckert was aware that Ahmed had mental health issues, was displaying suicidal ideation, and that there was a substantial risk that Ahmed would attempt suicide, yet he failed to take adequate steps to mitigate that substantial risk. Mr. Eckert additionally participated in and/or had knowledge of and failed to intervene in the conduct that exacerbated Ahmed's suicidal ideation and caused Ahmed to attempt suicide.

17.    At all times relevant to this Complaint, Stephen J. Maher was the Chief of Investigations for DOCCS and acting under color of state law. As Chief of Investigations for DOCCS, Mr. Maher was responsible for, *inter alia*, maintaining a safe, humane, and lawful environment for inmates be detecting and preventing inmate abuse and DOCCS staff misconduct. Mr. Maher was also responsible for preventing inmate suicides by, *inter alia*, effectively monitoring inmates, understanding potential suicide indicators, and knowing the appropriate responses when it was determined that an inmate might be at risk for self-harm or suicide. Mr. Maher was aware that Ahmed had mental health issues, was displaying suicidal ideation, and that there was a substantial risk that Ahmed would attempt suicide, yet he failed to take adequate steps to mitigate that substantial risk.

18.    At all times relevant to this Complaint, Jeffery K. Schiffer was Supervisor Offender Rehabilitation Coordinator at Attica, within DOCCS, and acting under color of state law. As Supervisor Offender Rehabilitation Coordinator at Attica, Mr. Schiffer was responsible for assuring that case management and counseling were performed in a consistent, systematic, and purposeful manner that increased inmates' intrinsic motivation to make positive changes in their lives. Mr. Schiffer was also responsible for preventing inmate suicides by, *inter alia*, effectively monitoring inmates, understanding potential suicide indicators, and knowing the appropriate responses when it was determined that an inmate might be at risk for self-harm or suicide. Mr. Schiffer was aware that Ahmed had mental health issues, was displaying suicidal ideation, and that there was a substantial risk that Ahmed would attempt suicide, yet he failed to take adequate steps to mitigate that substantial risk. Mr. Eckert additionally participated in and/or had knowledge of and failed to intervene in the conduct that exacerbated Ahmed's suicidal ideation and caused Ahmed to attempt suicide.

19.    At all times relevant to this Complaint, Leanna Latonna was Deputy Superintendent of Programs at Attica, within DOCCS, and acting under color of state law. As Deputy Superintendent of Programs at Attica, Ms. Latona was responsible for assuring that case management and programming were performed in a consistent, systematic, and purposeful manner that increased inmates' intrinsic motivation to make positive changes in their lives. Ms. Latona was also responsible for preventing inmate suicides by, *inter alia*, effectively monitoring inmates, understanding potential suicide indicators, and knowing the appropriate responses when it was determined that an inmate might be at risk for self-harm or suicide. Ms. Latona was aware that Ahmed had mental health issues, was displaying suicidal ideation, and that there was a substantial risk that Ahmed would attempt suicide, yet she failed to take adequate steps to mitigate that

substantial risk. Ms. Latona additionally participated in and/or had knowledge of and failed to intervene in the conduct that exacerbated Ahmed's suicidal ideation and caused Ahmed to attempt suicide.

20.     Defendants Artus, Eckert, Schiffer, and Latona (the "Attica Supervisor Defendants") were, at all times relevant to this Complaint, senior officials at Attica Correctional Facility who, acting under color of state law, exercised policymaking, supervisory, and disciplinary authority on behalf of DOCCS.

21.     At all times relevant to this Complaint, Michael J. Diebel and John and/or Jane Does Nos. 1, 2, 3, etc., (the "Officer Defendants") were Corrections Officers within DOCCS and acting under color of state law. Mr. Diebel and John and/or Jane Does Nos. 1, 2, 3, etc., were responsible for preventing inmate suicides by, *inter alia*, effectively monitoring inmates, understanding potential suicide indicators, and knowing the appropriate responses when it was determined that an inmate might be at risk for self-harm or suicide. Mr. Diebel and John and/or Jane Does Nos. 1, 2, 3, etc., were aware that Ahmed had mental health issues, was displaying suicidal ideation, that there was a substantial risk that Ahmed would attempt suicide, yet they failed to take adequate steps to mitigate that substantial risk. Mr. Diebel additionally participated in and/or had knowledge of and failed to intervene in the conduct that exacerbated Ahmed's suicidal ideation and caused Ahmed to attempt suicide.

22.     All Defendants are sued in their individual capacities.

## STATEMENT OF FACTS

23.     On April 6, 2016, Ahmed Ferhani was thirty-one years old and incarcerated at Attica Correctional Facility when he suffered severe brain damage after attempting to commit suicide.

24.     Born in Algeria, Ahmed began suffering significant mental health problems in his early childhood, which were exacerbated by exposure to excessive and inappropriate traumatic experiences.

25.     The rebellion of radical extremists in Algeria subjected Ahmed to threats and fear of death and violence against him and his family members due to his family's political affiliation and his mother's progressive stance on equal rights for women.

26.     At age 8, Ahmed was traumatized and sexually abused by a person in his neighborhood.

27.     Unable to comprehend or talk to others about these traumatic experiences, Ahmed's inner turmoil externally manifested itself in hyperactive and unsuitable behaviors.

28.     Ahmed escaped the traumas he suffered in Algeria when his family travelled to the United States in 1994, where Ahmed was subsequently granted political asylum. However, Ahmed continued to suffer traumatic experiences in the United States.

29.     When Ahmed began attending school in Queens, New York, he was regularly teased about his Muslim name and not being able to speak English.

30.     Ahmed was exposed to gang violence in Elmhurst, New York.

31.     Around age 11, Ahmed was improperly exposed to explicit sexual material by his godmother, which reignited the traumatic feelings he had suffered from being sexually abused.

32.     Around age 12, Ahmed began experimenting with drugs and alcohol in an attempt to numb his troubling feelings, but which resulted in exacerbating his psychological and behavioral difficulties.

33.     Ahmed's inability to cope with his psychological and behavioral difficulties began manifesting itself in suicidal ideation and acts of self-harm.

34.     In, approximately, early 2002, Ahmed was hospitalized after he reportedly attempted to commit suicide by cutting himself with a knife.

35.     Ahmed was hospitalized later that same year at Elmhurst Hospital Center in Elmhurst, New York, after threatening to hurt himself with a knife.

36.     During his hospitalization at Elmhurst, Ahmed was diagnosed with bipolar disorder and prescribed Depakote and psychiatric treatment.

37.     In 2003, Ahmed was arrested with his friends for robbery and sentenced to an inpatient substance abuse treatment program.

38.     Ahmed was initially committed to the Marcy Psychiatric Facility and then completed his program at Samaritan Daytop Village.

39.     In 2004, Ahmed was again hospitalized at Elmhurst hospital for cutting himself.

40.     Ahmed's mental health records report that he had been cutting himself since the age of 14, and that he had visibly prominent scars on both of his upper arms as a result.

41.     In 2006, Ahmed cut his wrist after becoming upset over a fight with his girlfriend and was hospitalized at Queens Central Hospital.

42.     Hospital records from that time describe Ahmed as suffering from depression and bipolar disorder.

43.     In 2008, Ahmed was sent to Rikers Island for several months after being charged with attempted assault. There, he attempted suicide by using a bedsheet to hang himself due, in part, to harassment from corrections officers.

44.     Ahmed was cut down before suffering serious injury and sent to Bellevue hospital.

45.    Medical personnel at Bellevue noted Ahmed had issues regarding his ability to tolerate frustration and that his suicidal ideation seemed directly related to his being incarcerated and his feelings of hopelessness.

46.    Ahmed tearfully told medical personnel at Bellevue that he dreamed of putting a rope around his neck and jumping off the Empire State Building.

47.    Doctors at Bellevue sought to help Ahmed by nurturing safe and appropriate ways for him to manage his stress and anxieties.

48.    In or about October 2010, Ahmed was arrested for attempted robbery.

49.    Ahmed maintained his innocence and was released on his own recognizance but was subsequently taken back into custody because the arrest had caused him to miss an appointment with his parole officer.

50.    Ahmed spent approximately two-and-one-half months on Rikers Island, during which time he was constantly moved from one housing unit to another and not allowed to attend religious services.

51.    Ahmed was released from Rikers Island on or about December 30, 2010.

52.    At the time of his release, Ahmed was particularly worried by his lack of financial means and his inability to help his family who were about to lose their home through foreclosure.

53.    Ahmed desperately sought to gain financial support for his family and himself by seeking employment and trying to start a small business. He was not successful.

54.    Ahmed became extremely depressed, upset, and mentally depleted from his recent incarceration and his current situation.

55.    During this time, Ahmed became dependent on a person known as Ilter, who began providing Ahmed with financial and emotional support.

56.     Ilter had ensnared Ahmed by pretending to be Ahmed's friend, helping Ahmed with his expenses, and promising to get Ahmed a job so that Ahmed could support himself and his family, as well as rescue his family's home from foreclosure.

57.     On May 12, 2011, after participating in a ploy that Ilter had devised, Ahmed was arrested on charges of conspiracy and weapons charges related to terrorism.

58.     Ahmed was remanded to Rikers Island.

59.     Ahmed was severely distraught at the predicament he found himself in and by the tremendous difficulties he had unwittingly placed on his family.

60.     Ahmed's distress was palpable and caused him to repeatedly be placed on suicide watch at Rikers Island.

61.     Ahmed was prescribed Remeron for his depression, but frequently did not take it.

62.     Mental health staff at Rikers Island reported that Ahmed was refusing any psychotic medication.

63.     In or about November 2011, while still incarcerated at Rikers Island, Ahmed attempted to kill himself by ingesting batteries, but was not successful.

64.     After this suicide attempt, mental health staff reported that Ahmed was showing a radical change in behavior.

65.     In or about December 2011, Ahmed cut his neck while on suicide watch and was sent to Bellevue Hospital for a psychiatric evaluation.

66.     Medical personnel at Bellevue noted that Ahmed had scars on both his arms from the elbow up that plainly demonstrated numerous prior attempts to harm himself.

67.     Ahmed told medical personnel at Bellevue that he harmed himself when he was frustrated because it helped him focus on the pain rather than his problems.

68.     Medical personnel at Bellevue diagnosed Ahmed as suffering from adjustment disorder with depressed mood.

69.     The medical personnel noted that Ahmed's bipolar disorder remained active.

70.     Medical personnel assessed Ahmed as a danger to himself when his depression escalated and that his recent self-harming gesture had been due to escalating depression over his recent arrest and legal situation.

71.     On December 30, 2011, staff at Bellevue returned Ahmed to Rikers Island after noting he was calm, cooperative, and denied suicidal ideation.

72.     Shortly thereafter, on January 1, 2012, Ahmed was sent from Rikers Island to Bellevue Hospital after he tried to hang himself with a strip of cloth.

73.     Staff at Bellevue noted Ahmed was suicidal and suffering from adjustment disorder with depressed mood, administered Ativan and Risperdal, and returned him to Rikers Island, where he was again placed on suicide watch.

74.     On April 20, 2012, Ahmed was placed on suicide watch in the Rikers Island mental health unit because he was reportedly at risk for suicidal gestures or suicide.

75.     Ahmed remained in the Rikers Island mental health unit until June 29, 2012.

76.     On September 25, 2012, Ahmed was again referred to the mental health unit because of a self-harm injury.

77.     On or about December 4, 2012, Ahmed pled guilty to the criminal charges that had been lodged against him.

78.     On or about March 11, 2013, while awaiting sentencing, a licensed medical health counselor at Rikers Island diagnosed Ahmed with active adjustment disorder with mixed anxiety and depressed mood.

79.    On or about March 15, 2013, Ahmed was sentenced to 10 years in prison.

80.    At his sentencing, Ahmed apologized to his family and noted that they had been unfairly humiliated, attacked, and harassed daily since his arrest.

81.    Ahmed stated his determination to use his time in custody to better himself and to continue pursuing his dreams and goals, which included being able to financially support himself and his family.

82.    Ahmed's defense counsel specifically requested that Ahmed be provided mental health treatment when he entered the DOCCS' system.

83.    The court sentencing Ahmed directed that DOCCS be provided with a psychological evaluation of Ahmed, commissioned by Ahmed's defense counsel, that documented Ahmed's mental health issues and history of suffering from unresolved past experiences and psychiatric traumas.

**Ahmed Enters the DOCCS System**

84.    On or about April 1, 2013, Ahmed was transferred to Downstate Correctional Facility for intake into the DOCCS system.

85.    As part of the intake procedure, Ahmed was subjected to a health screening.

86.    The nurse who performed Ahmed's health screening documented that Ahmed had a history of mental health treatment, including psychosis and affective mood disorders; had been prescribed mental health medication, which he had a history of refusing to take; that he was currently a mental health patient; that he had attempted suicide; and that he was presently complaining about his mental health.

87.    As a result of his health screening, Ahmed was given a mental health screening by an OMH staff member.

88.     DOCCS partners with OMH in assessing and caring for mentally ill persons in DOCCS's custody and shares responsibility for the prevention of inmate suicides.

89.     The OMH staff member who performed Ahmed's mental health screening documented that Ahmed had a history of suicidal and violent behavior, had been hospitalized for mental health treatment in the past 5 years, had received outpatient treatment for mental health problems, and had been a victim of sexual abuse.

90.     Ahmed was further evaluated by OMH psychologist Christopher Boydston.

91.     Dr. Boydston reviewed Ahmed's OMH file and paperwork that had been prepared at Rikers Island regarding Ahmed.

92.     Upon information and belief, Dr. Boydston learned from OMH and Rikers Island records that Ahmed had a history of significant mental health diagnoses, including, *inter alia*, depression, bipolar disorder, mood disorder (not otherwise specified), borderline personality disorder, antisocial personality disorder, and adjustment disorder with mixed emotional features.

93.     Mental health disorders are a significant risk factor associated with suicide.[1]

94.     Upon information and belief, Dr. Boydston learned from OMH and Rikers Island records that Ahmed had been sexually abused as a child.

95.     A history of adverse childhood experiences, and specifically trauma, is a significant risk factor associated with suicide.[2]

96.     Upon information and belief, Dr. Boydston learned from OMH and Rikers Island records that Ahmed had a history of drug and alcohol abuse.

---

[1] OMH Suicide Prevention Office, *1,700 Too many: New York State's Suicide Prevention Plan 2016-17*, New York State Office of Mental Health, 4 (2016), available at: https://omh.ny.gov/omhweb/resources/publications/suicde-prevention-plan.pdf
[2] *Id.*

97.    A history of drug and alcohol abuse is a significant risk factor associated with suicide.[3]

98.    Upon information and belief, Dr. Boydston learned from OMH and Rikers Island records that Ahmed had been treated with a variety of psychiatric medications, including, *inter alia*, Depakote, Seroquel, Lamotrigine, and Remeron.

99.    Upon information and belief, Dr. Boydston learned from OMH and Rikers Island records that Ahmed had a history of suicidality, suicide attempts, and suicidal ideation, which were referenced in Ahmed's medical and mental health records that were maintained by OMH.

100.    A history of suicide attempts is a significant risk factor associated with suicide.[4]

101.    Upon information and belief, Dr. Boydston was aware from DOCCS and OMH records that a triggering factor for Ahmed's suicidality was imprisonment and frustration with mistreatment while being imprisoned.

102.    Upon information and belief, Dr. Boydston was aware that Ahmed had recently been on suicide watch numerous times while in New York City Department of Corrections custody, had attempted suicide by ingesting batteries, and had been making suicidal gestures that caused him to be placed on suicide watch.

103.    Upon information and belief, Dr. Boydston learned from OMH and Rikers Island records that Ahmed had a history of harming himself and that his arms were covered with scars as a result.

104.    A history of non-suicidal self-injury is a significant risk factor associated with suicide.[5]

---

[3] *Id.*
[4] *Id.*
[5] *Id.*

105.    Dr. Boydston documented that Ahmed showed chronic risk factors for suicide based on, *inter alia*, his mental health history, his history of psychiatric hospitalizations, his borderline/antisocial personality traits, and prior suicidal ideation, threats, and gestures.

106.    Dr. Boydston noted that prominent protective factors to prevent Ahmed from harming himself in the future were support from his mother and father, support from his religious beliefs, and keeping him positively oriented towards his future.

**The "Front Line" of Defense in Preventing Inmate Suicides**

107.    All DOCCS employees are responsible for ensuring the security, safety, and welfare of inmates.

108.    DOCCS describes Corrections Officers as the "front line" of defense in preventing inmate suicides.

109.    Corrections Officers are responsible for preventing suicides by effectively monitoring inmates, understanding potential suicide indicators, and knowing the appropriate responses when it is determined that an inmate may be at risk for self-harm or suicidal behavior.

110.    Corrections Officers are purportedly taught to identify and understand risk factors for suicide, including, *inter alia*, mental health disorders, prior suicide attempts, victimization by sexual abuse, and prior psychiatric treatment.

111.    Corrections Officers are taught that a major risk factor for inmate suicide is "prison stress" caused by, *inter alia*, disciplinary sanctions, perceived harassment by security staff, threats, intimidation, and bullying and teasing.

**Ahmed is Transferred to Great Meadow and Abused by Corrections Officers**

112.    On or about August 23, 2013, Ahmed was transferred to Great Meadow Correctional Facility.

113.    Although Corrections Officers at Great Meadow were aware of their responsibility as the "front line" of defense in preventing inmate suicides and that Ahmed had numerous chronic and acute risk factors that created a significant risk that Ahmed would harm himself or commit suicide, Corrections Officers acted to exacerbate, rather than de-escalate, Ahmed's suicidal risk factors.

114.    Corrections Officers at Great Meadow subjected Ahmed to nonstop intimidation, threats, harassment, and harsh treatment.

115.    Corrections officers repeatedly referred to Ahmed as a "dirty Arab," "sand nigger," and a "terrorist."

116.    Ahmed also suffered constant sexual harassment.

117.    For example, Ahmed was repeatedly groped and gratuitously fondled during pat frisks by corrections officers who laughed at the distress they caused him.

118.    Ahmed was frequently afraid to leave his cell because of the corrections officers' intimidating actions towards him.

119.    In or about August 2014, Ahmed was confronted by a group of corrections officers who told him: "Terrorists don't last long here. White power!"

120.    On August 21, 2014, Ahmed wrote DOCCS Commissioner Anthony J. Annucci, Deputy Commissioner Joseph Bellnier, and Inspector General Justin Pinze to advise them of his mistreatment and to document that he was "overwhelmed" by the constant intimidation and harassment he was receiving from corrections officers. He told them that he lived in constant fear of being hurt.

121.    Ahmed further advised DOCCS officials that he was afraid to file any formal grievances regarding his treatment because he feared retaliation.

122.    On September 8, 2014, Ahmed was returning to his housing unit from a vocational program when Corrections Officer Holden approached him and said, "Don't blow nothing up motherfucker or I'll blow a hole in your ass."

123.    Having been a victim of rape and violence, Ahmed was deeply disturbed by Officer Holden's threat.

124.    On September 28, 2014, Ahmed was going to recreation when Officer Holden pointed at him and said, "Hey you terrorist, don't blow nothing up."

125.    Officer Holden's comment brought negative attention to Ahmed from other inmates, who questioned Ahmed as to whether what Officer Holden said was true.

126.    On October 2, 2014, Ahmed wrote then United States Attorney General Eric Holder to complain about his treatment at Great Meadow. Ahmed sent copies of this letter to DOCCS Commissioner Annucci, Great Meadow Superintendent Miller, and other DOCCS officials.

127.    Ahmed stated that his main intention in complaining about his treatment was to ensure his safety and wellbeing so that he could "continue to remain alive and productive until [his] release."

128.    On or about October 31, 2014, Assistant Commissioner James O'Gorman responded to Ahmed's letter by stating that there was no support for Ahmed's allegations and that he should address his concerns to the facility officials -- the same officials that Ahmed complained were harassing and intimidating him.

129.    Corrections officers at Great Meadow continued to threaten Ahmed and told him that he would not be comfortable as long as he was at Great Meadow.

130.    On March 24, 2015, Ahmed was assaulted at Great Meadow in the shower area of the Honor Block gym.

131.    Ahmed was struck on the head from behind and immediately lost consciousness.

132.    When Ahmed regained consciousness, he found himself on a stretcher surrounded by corrections officers who were laughing at him and slapping his feet.

133.    Ahmed suffered a laceration to the top of his head requiring 12 staples, as well as lacerations to his face, forehead, and neck.

134.    While Ahmed was recovering in the hospital, corrections officers purportedly investigating the assault suggested to Ahmed that he had actually hurt himself and that things would "go a lot smoother" for Ahmed if he accepted that.

135.    Lieutenant Winchel insisted to Ahmed that Ahmed had hurt himself and said that, if Ahmed was not "honest," he would be placed in solitary confinement or administrative segregation.

136.    When Ahmed told Lieutenant Winchel that he believed corrections officers were responsible for his assault, Lieutenant Winchel became angry and told Ahmed, "I don't want to hear that coming from your mouth again."

137.    Ahmed was eventually discharged from the hospital and placed in "protective custody."

138.    While in "protective custody," Ahmed was repeatedly threatened by corrections officers who yelled things at him such as, "Motherfucker, this aint over," and "It doesn't matter where you go."

139.    While in "protective custody," Ahmed was improperly denied medical attention, recreation, telephone use, and law library services.

140.    Ahmed learned that requests he had made to see medical personnel, along with his mail, were being thrown in the trash.

141.    The corrections officers' treatment of Ahmed caused him to become frustrated, frightened, and extremely depressed.

142.    Ahmed sought help for his extreme depression by requesting mental health services, but corrections officers and nurses denied Ahmed's requests without explanation and threw his requests in the trash.

143.    As a result of the corrections officers' actions, Ahmed's depression worsened, and he feared for his life even more than he had before he was placed in protective custody.

144.    On March 27, 2015, Ahmed documented the mistreatment he was suffering in protective custody in a letter he sent to Superintendent Miller, which stated, *inter alia*, that he was suffering and feared he would not "make it out of this situation alive."

145.    On March 28, 2015, Ahmed filed a grievance complaining that corrections officers were denying him showers, food, recreation, and legal services.

146.    Ahmed complained that he had not been able to eat, shower, or speak to his family for three days.

147.    Ahmed additionally complained that other inmates were being encouraged to hurt him. For example, corrections officers told inmates that, if they hurt Ahmed, the corrections officers would handle "the rest."

148.    Ahmed stated in his grievance that he feared greatly for his life.

149.    Upon information and belief, Ahmed did not receive a response to his March 28, 2015 grievance.

150.    On March 28, 2015, Ahmed also filed a grievance complaining that his requests to be seen by mental health services were being ignored.

21

151.    Ahmed's grievance explained that he had been "receiving constant threats and intimidation by officers" since his assault and that he was extremely depressed and having trouble sleeping.

152.    Ahmed's grievance further stated that he was not in a stable state of mind and that he needed to speak to someone immediately.

153.    Upon information and belief, Ahmed did not receive a response to his March 28, 2015 grievance complaining of his inability to receive mental healthcare.

154.    On April 3, 2015, Ahmed filed another grievance complaining that his requests for medical attention were being ignored by corrections officers.

155.    Ahmed stated that he was suffering from "excruciating headaches and pressure on his head" and that he had "not been able to sleep more than one hour at a time at night."

156.    Ahmed additionally stated that he suffered from extreme back and neck pain and that he needed pain medication.

157.    Upon information and belief, Ahmed did not receive a response to his April 3, 2015 grievance.

158.    On or about April 6, 2015, Ahmed was supposed to attend a hearing regarding his placement in involuntary protective custody because of the assault he had suffered.

159.    After being verbally intimidated and subjected to physical force by the corrections officers who were supposed to escort him to his hearing, Ahmed refused to leave his cell and missed the meeting.

160.    Ahmed wrote to Superintendent Christopher Miller that same day and complained about the corrections officers who had caused him to miss the hearing.

161. Ahmed also complained to Superintendent Miller that his grievances were not being responded to.

162. Ahmed advised Superintendent Miller that he constantly feared for his life and safety, suffered never ending threats and intimidation from corrections officers, and pleaded that corrections officers leave him alone.

163. Ahmed advised Superintendent Miller that he was "tired of being the punching bag."

164. Ahmed asked Superintendent Miller if he and his corrections officers would only be happy when he was dead.

## Ahmed is Transferred to Attica and Abused by Corrections Officers

165. On or about April 15, 2015, a staff attorney for Prisoner Legal Services wrote the Superintendent of Great Meadow and requested that Ahmed be transferred to another correctional facility "due to the imminent risk of serious harm he faces" at Great Meadow.

166. On or about April 28, 2015, a correctional officer told Ahmed: "I have buddies in both Attica and Coxsackie. You better pray they don't send you there you fucking terrorist."

167. Ahmed requested that he be transferred to a prison that was closer to New York City so it would be easier for his family and fiancé to visit him.

168. DOCCS personnel understood that support from Ahmed's family was a significant factor in protecting Ahmed from engaging in self-harm or suicidal behaviors.

169. Instead of transferring Ahmed to a prison that was closer to New York City, Ahmed was transferred to Attica on May 28, 2015, which was much further away from his family than Great Meadow.

170. Being transferred to Attica caused Ahmed to suffer serious depression.

171.    Ahmed was additionally frightened because of the threat that a correction officer's "associates" at Attica would ensure Ahmed continued to suffer.

172.    After being transferred to Attica, Ahmed attempted to minimize his movements in the prison to prevent negative interactions with corrections officers.

173.    However, corrections officers, including, upon information and belief, Defendant Correction Officers Michael J. Diebel and John Does Nos. 1, 2, 3, etc., continuously harassed and intimidated Ahmed.

174.    When corrections officers encountered Ahmed, they would harass Ahmed by saying things like "Fucking ISIS," "Keep thinking you're good here," or "Kill yourself, bitch."

175.    One corrections officer said to Ahmed, "How does an ISIS member get a white girl like that," referring to Ahmed's fiancé.

176.    Ahmed was placed in A Block were a correctional officer repeatedly threatened Ahmed's life.

177.    Ahmed was transferred to C Block, but the correctional office from A Block was also moved to C block and continued to threaten him.

178.    Upon being returned to A Block, correctional officers continued to repeatedly harass and intimidate Ahmed.

179.    Ahmed asked the head of the program committee at Attica, Defendant Jeffery K. Schiffer, to be assigned to a vocational trade that would enable him to support himself and his family upon his release from prison, such as building maintenance or small engine repair.

180.    However, Defendant Schiffer, who, upon information and belief, was aware that harassment and the frustration of Ahmed's attempts to work towards his goals were significant

factors that triggered suicidality in Ahmed, responded that he could not help Ahmed obtain vocational training because he did not want Ahmed to "make a bomb."

181.   Defendant Schiffer also harassed Ahmed by asking him why he wanted to be a Muslim and starve himself when he could be a Christian and get presents for Christmas.

182.   When Ahmed continued to request training for a meaningful vocation, Defendant Schiffer called Defendant Stewart T. Eckert, Deputy Superintendent of Security at Attica, and told him, "Guess who I have here?" referring to Ahmed, and then proceeded to laugh and make jokes over the phone at Ahmed's expense.

183.   Upon information and belief, Defendant Eckert, who was aware that harassment and the frustration of Ahmed's attempts to be future oriented were significant factors that triggered suicidality in Ahmed, told Defendant Schiffer to deny Ahmed's request and keep him "idle."

184.   Defendant Schiffer eventually hung up the phone and told Ahmed, "Well, the boss said to place you id[le]," and to check with him again in six months.

185.   Ahmed was deeply upset by Defendant Schiffer's conduct and filed a complaint.

186.   Upon information and belief, Ahmed did not receive a response to his complaint about Defendant Schiffer's conduct.

187.   When ten months passed without Ahmed being provided any opportunities for vocational training, Ahmed wrote Defendant Schiffer and again requested the opportunity to learn a useful trade such as building maintenance or small engine repair.

188.   Defendant Schiffer responded to Ahmed's request by enrolling him in lithograph training which, upon information and belief, Defendant Schiffer knew would frustrate Ahmed's goal of learning a useful skill to enable him to support himself and his family when he was released from prison.

189.    Ahmed wrote a letter to Defendant Leanne Latona, Deputy Superintendent of Programs at Attica, and advised her of his interactions with Defendant Schiffer and his inability to obtain training in a useful skill.

190.    Upon information and belief, Defendant Latona, who was aware that harassment and the frustration of Ahmed's attempts to be future oriented were significant factors that triggered suicidality in Ahmed, intentionally did not respond to Ahmed's complaint.

191.    On November 11, 2015, Ahmed wrote then United States Attorney Loretta Lynch to document his abuse and seek resolution of his issues with corrections officers before "something terrible" happened to him.

192.    On January 5, 2016, Ahmed wrote to Defendant Dale Artus, Superintendent of Attica, and complained that he was not receiving money that his family had been sending to him or depositing in his commissary account. Ahmed noted that he had been humble and patient despite the incessant harassment he suffered, and that he would seek a legal injunction if the problem did not get rectified.

193.    On January 15, 2016, Deputy Superintendent for Administration Susan Squires responded to Ahmed's January 5, 2016 complaint by implying that his family must be improperly making deposits.

194.    On February 28, 2016, Ahmed was transferred back to A Block.

195.    As soon as Ahmed was transferred back to A Block, corrections officers there, including, upon information and belief, Defendant Corrections Officers Diebel and John Does Nos. 1, 2, 3, etc., began harassing, threatening, and intimidating Ahmed.

196.    For example, these corrections officers would throw feces and bacon into Ahmed's cell.

26

197.    Ahmed wrote Defendant Eckert regarding the harassment and threats he was receiving from correctional officers and asked why he had been returned to A Block.

198.    Upon information and belief, Defendant Eckert knew that harassment and bullying by corrections officers was a significant risk factor for suicide for Ahmed.

199.    Upon information and belief, Defendant Eckert did not perform any meaningful investigation into Ahmed's complaint that he was being harassed and threatened by correctional officers.

200.    On March 1, 2016, Defendant Eckert responded to Ahmed by stating that his housing was correct and that he did not see any "evidence to the contrary."

201.    Defendant Eckert did not address Ahmed's complaints about the harassment, threats, and intimidation he was receiving from corrections officers.

202.    Ahmed continued to suffer harassment, threats, and intimidation in A Block.

203.    On March 14, 2016, Ahmed was drug tested and tested positive for cannabinoids. Ahmed admitted to cannabinoid use and was given a punishment of 30 days in keep lock.

204.    This was Ahmed's first offense for drug use while being incarcerated.

205.    At or about this time, Ahmed wrote another letter to United States Attorney General Loretta Lynch, which was copied to Defendants Anthony J. Annucci, Acting Commissioner of FOCCS, Defendant Superintendent Artus, and several other persons.

206.    Ahmed stated that he was writing to "document all of the human rights abuses [he had] suffered and endured at the hands of corrections officers."

207.    Ahmed described the "constant threats, harassment, name calling, [and] retaliation tactics" perpetrated by, on information and belief, Defendants Corrections Officers Officer Diebel and John Does Nos. 1, 2, 3, etc., that caused him to suffer while being incarcerated at Attica.

208.    Ahmed stated that he had become "emotionally and mentally drained due to the constant oppression and hatred I face and endure every day here in this facility."

209.    Ahmed stated that his "mental health diagnosis is difficult to manage as it is but even more difficult to manage in such a cruel and wicked environment that has been dedicated to destroying rather than helping [him]."

210.    Ahmed stated that he was "sick and tired of not sleeping and constantly looking over [his] shoulders."

211.    Ahmed stated that his situation had recently caused him to be suicidal and that he had been close to taking his own life.

212.    While Ahmed stated that he was not presently suicidal, he stated that he could become suicidal if corrections officers continued acting with "hatred and oppression" towards him.

213.    Ahmed stated that he "fully expect[ed]" retaliation by corrections officers for his letter.

214.    Ahmed stated that, "this time around," he welcomed the retaliation and looked forward to it.

215.    Ahmed stated that he wanted everyone to know that he would take his own life the next time he was "violated" by corrections officers or their superiors.

216.    Ahmed stated, "If taking my own life is the only way to expose the evils that are practiced daily by corrections officers then I will be glad to do it."

217.    Upon information and belief, Defendants Acting Commissioner Annucci, Superintendent Artus, Deputy Superintendent Eckert, Deputy Supervisor Offender Rehabilitation Coordinator Schiffer, and Superintendent for Program Services Latona received a copy of, or were made aware of, Ahmed's letter to Attorney General Lynch on or about April 4, 2016.

218.    Upon information and belief, Defendants Acting Commissioner Annucci, Superintendent Artus, Deputy Superintendent Eckert, Deputy Supervisor Offender Rehabilitation Coordinator Schiffer, and Superintendent for Program Services Latona read Ahmed's April 2016 letter to Attorney General Lynch and recognized that it threatened self-harm and suicide, as well as chronicling numerous other factors indicating that Ahmed was at great risk of self-harm or suicidal behavior.

219.    Defendants Acting Commissioner Annucci, Superintendent Artus, Deputy Superintendent Eckert, Deputy Supervisor Offender Rehabilitation Coordinator Schiffer, and Superintendent for Program Services Latona had been trained by DOCCS to take seriously the type of indications of self-harm or suicidal behavior that Ahmed was displaying and, given the potential risk to human life, to respond appropriately, for example, by referring the at-risk inmate to OMH for a mental health screening or by putting them on suicide watch.

220.    Despite their awareness and training, Defendants Acting Commissioner Annucci, Superintendent Artus, Deputy Superintendent Eckert, Deputy Supervisor Offender Rehabilitation Coordinator Schiffer, and Superintendent for Program Services Latona disregarded the warning signs that Ahmed was at risk for self-harm or suicide and did not take any appropriate actions in response to Ahmed's April 2016 letter.

221.    As a result of the inaction by Defendants Acting Commissioner Annucci, Superintendent Artus, Deputy Superintendent Eckert, Deputy Supervisor Offender Rehabilitation Coordinator Schiffer, and Superintendent for Program Services Latona, corrections officers continued to harass, bully, and threaten Ahmed.

222.    Upon information and belief, Defendant Corrections Officers Diebel and John Does Nos. 1, 2, 3, etc., were aware that Ahmed had numerous chronic and acute suicide risk factors,

including susceptibility to perceived harassment and bullying by security staff, that created a significant risk that he would harm himself or commit suicide.

223.    Despite this awareness, and in disregard of Ahmed's chronic and acute suicide risk factors, Defendant Corrections Officer Diebel and John Does Nos. 1, 2, 3, etc., encouraged Ahmed to kill himself and told him "to die."

224.    In or about April 2016, Ahmed wrote a letter to Superintendent Artus stating that he had "reached both [his] emotional and psychological limit" and intended to take his own life.

225.    The Attica Superintendent's Office received Ahmed's letter on April 6, 2016.

226.    On April 6, 2016, at approximately 11:30 a.m., Ahmed hanged himself in his cell.

227.    Corrections officers found him sitting on the cell floor with a string wrapped around his neck and tied to the cell bars. He was not breathing and had no pulse.

228.    Corrections officers cut the string around Ahmed's neck and began applying CPR and an Automated External Defibrillator.

229.    Ahmed was transferred to the prison Emergency Room, where lifesaving measures continued. Ahmed's pulse eventually returned, and Ahmed began breathing with assistance.

230.    Ahmed was transferred to Erie County Medical Center and admitted to the Intensive Care Unit in critical condition.

231.    Scans of Ahmed's brain revealed that it had been damaged from lack of blood and oxygen and diagnosed Ahmed as suffering from Acute Metabolic Encephalopathy, Anoxic Brain Damage, and Acute Respiratory Failure with Hypoxia.

232.    After a few days of treatment, doctors noted that Ahmed was not responding to verbal stimuli and only responded to tactile stimuli with erratic movements.

233.    Doctors observed that Ahmed only opened his eyes when he was agitated and that there was no purpose to his bodily movements.

234.    Ahmed was diagnosed as having cortical blindness because of his brain damage.

235.    Doctors reported that Ahmed had recurring episodes in which he was extremely agitated and moved all his extremities erratically, which were treated with Haldol, Ativan, and Morphine.

236.    Doctors noted that Ahmed appeared to have a history of suicide attempts and obvious cutting wounds to both arms.

237.    Doctors reported that the fact that Ahmed was showing very little meaningful neurological function and no purposeful interaction with the environment one month after the initiating event was a poor prognostic sign that Ahmed would experience any significant degree of meaningful recovery.

238.    As a result of the brain damage and other injuries resulting from Ahmed's April 6, 2016 suicide attempt, Ahmed was, and continues to be, unable to protect his legal rights or to function in society.

239.    Ahmed was discharged from Erie County Medical Center on May 5, 2016 and transferred to the Walsh Regional Medical Unit at Mohawk Correctional Facility with a diagnosis that included cardiopulmonary arrest, anoxic brain injury with poor neurological recovery, and chronic respiratory failure.

240.    Staff at Walsh described Ahmed as alternating between periods of calmness and periods of agitation.

241.    Ahmed required constant supervision and interventions by nursing and security staff to maintain his safety.

242.    A social worker stated that Ahmed was incapable of communication and could not provide any coherent behavioral response to verbal interaction with staff.

243.    Medical staff reportedly kept constant watch over Ahmed because of his medical condition and ongoing agitation.

244.    A May 4, 2017 DOCCS Physical Examination by Dr. Salvana reported that Ahmed is cortically blind, has anoxic encohalopathy, anoxic brain injury, requires 1/1 nursing assistance, incontinent of urine and stool, disartic speech, with spastic non purposeful movements. His physical limitations are listed as: "requires total assistance."

245.    Ahmed was granted medical parole and discharged from Walsh Correctional Facility to the Terrence Cardinal Cooke Harlem Nursing Home on or about May 9, 2019.

246.    On or about May 8, 2020, Ahmed was discharged from Terrence Cardinal Cooke Harlem Nursing Home to the home of his mother, Ms. Zahaf.

247.    Since May 8, 2020, Ms. Zahaf has personally cared for Ahmed in her home with the assistance of home nursing aides and arranges for all of Ahmed's medical needs to be met by scheduling regular appointments with doctors, psychiatrists, and physical therapists.

248.    Ahmed continues to be unable to protect his legal rights or to function in society because of the brain damage he suffered on April 6, 2016.

### FIRST CLAIM FOR RELIEF
#### 42 U.S.C. § 1983 – Violation of the Eighth Amendment
#### Deliberate Indifference to Known Risk of Suicide
#### (Against Individual Defendants)

249.    On behalf of Ahmed Ferhani, who is unable to protect his legal rights, Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

250.    Anthony J. Annucci, the Attica Supervisor Defendants, Stephen J. Maher, and the Correction Officer Defendants were all deliberately indifferent to Mr. Ferhani's serious medical condition.

251.    On or about April 4, 2016, these defendants were aware that Ahmed had written a letter to Lorretta Lynch, copied to Superintendent Artus and Mr. Maher, indicating that he was suicidal, that he intended to commit suicide the next time Corrections Officers or their superiors "violated" him, and that he "welcomed" and was "looking forward" to doing so.

252.    These defendants were aware that Ahmed exhibited numerous chronic and acute suicide risk factors that created a significant risk that he would commit suicide, including, *inter alia*, Ahmed's documented history of mental illness that included several instances of self-harm and attempted suicide. These defendants were also aware of Ahmed's complaints of incessant abuse by Corrections Officers and that his grievances would continue unless action was taken.

253.    From the aforementioned facts, the Attica Supervisors, Stephen J. Maher, and the Officer Defendants, upon information and belief, actually inferred that there was a substantial risk of serious harm to Ahmed's health and safety and that he was, in fact, suicidal.

254.    Nevertheless, these defendants failed to take any action or adequate steps to mitigate the substantial risk that Ahmed would attempt suicide. These defendants did not address the concerns Ahmed had expressed in his letter to Lorretta Lynch, provide him with adequate mental health care, increase his supervision, and/or transfer him to another facility.

255.    Despite the substantial risk that Ahmed would attempt suicide, the Corrections Officer Defendants goaded Ahmed into taking his life and told him he should die.

256.    Defendants were aware that their actions and inaction posed an excessive risk of serious harm to Ahmed's life, health, and safety, and they consciously disregarded that risk.

257.    The conduct of these defendants was willful, wanton, malicious, and/or performed with reckless disregard of the consequences and constitutes a conscious indifference to the clear risk of death or serious injury to Ahmed that shocks the conscience.

258.    Defendants acted under color of state law.

259.    Defendants' deliberate indifference to Ahmed's serious medical condition proximately caused Ahmed to suffer extraordinary physical and emotional pain and suffering, anoxic brain damage, cardiac arrest, pneumonia, and other injuries.

260.    All of the foregoing constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

261.    As a result of the foregoing, Ahmed, through his Guardian, the Plaintiff, is entitled to recover compensatory and punitive damages in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
**42 U.S.C. § 1983 – Violation of the Eighth Amendment**
**Supervisory Liability**
**(Against Commissioner Annucci, Chief of Investigations Maher, and**
**the Attica Supervisor Defendants)**

262.    On behalf of Ahmed Ferhani, who is unable to protect his legal rights, Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

263.    The constitutional violations of defendants alleged herein occurred as a result of the failure of Defendants Acting Commissioner Annucci, Chief of Investigation Maher, and the Attica Supervisor Defendants to adequately supervise, investigate, and discipline DOCCS employee conduct.

264.    Defendants Acting Commissioner Annucci, Chief of Investigation Maher, and the Attica Supervisor Defendants failed to adequately supervise, investigate, and discipline subordinate DOCCS employees with regard to preventing deliberate indifference to the serious

mental health needs and physical safety of inmates in their custody. These defendants' failure to supervise, investigate, and discipline DOCCS employees amounted to deliberate indifference to inmates' right to be free from deliberate indifference to their serious mental health needs and their physical safety.

265.    Defendants Acting Commissioner Annucci, Chief of Investigation Maher, and the Attica Supervisor Defendants were aware of the particular dangers faced by inmates with mental health needs such as Ahmed's. They knew that Ahmed had a serious history of mental health issues that included suicidal ideation, numerous attempts at suicide, and numerous incidents of self-harm, that he was suffering from suicidal ideation, and that, on or about April 4, 2016, he threatened to commit suicide if Corrections Officers continued to harass, bully, and "violate" him. These defendants knew that Correction Officer harassment and bullying of an inmate with a history of serious mental health issues, suicide attempts, and self-harm who had declared his intention to commit suicide if Corrections Officers continued to bully and harass him constituted a chronic risk that Ahmed would attempt suicide. These defendants were aware from documentation by the New York State Correctional Association that Corrections Officers at Attica had an unconstitutional routine of harassing and bullying inmates that had been going on for years.

266.    Defendants Acting Commissioner Annucci, Chief of Investigation Maher, and the Attica Supervisor Defendants were aware of numerous complaints Ahmed had made to them and other authorities regarding his suicidal ideation and his suffering that resulted from his continual harassment and bullying by Corrections Officers but failed to take any corrective and/or protective action. These defendants did not take obvious corrective and/or protective actions, such as referring Ahmed to OMH for a mental health evaluation, placing Ahmed on suicide watch or some other form of monitoring, investigating Ahmed's complaints of Corrections Officer bullying and

harassment, or advising the Corrections Officers who interacted with Ahmed, the "front line" of defense in preventing inmate suicides, of Ahmed's suicidal ideation and that care should be taken in interacting with him. Despite their knowledge, Defendants Acting Commissioner Annucci, Chief of Investigation Maher, and the Attica Supervisor Defendants, through deliberate indifference, with malicious intent, willful ignorance, and/or gross negligence, ignored the chronic risk that Ahmed would commit suicide and thereby facilitated Ahmed's suicide by not taking any protective actions and by tacitly condoning Corrections Officers to continue harassing and bullying Ahmed.

267.    Corrective and/or protective actions by Defendants Acting Commissioner Annucci, Chief of Investigation Maher, and the Attica Supervisor Defendants would have prevented Ahmed from attempting suicide.

268.    The above-described failure of Acting Commissioner Annucci, Chief of Investigation Maher, and the Attica Supervisor Defendants to supervise their subordinates demonstrated deliberate indifference and/or gross negligence towards inmates, including Ahmed, who suffered constitutional violations at the hands of correctional officers.

269.    As a direct and proximate result of the failure of Acting Commissioner Annucci, Chief of Investigation Maher, and the Attica Supervisor Defendants to supervise, Ahmed Ferhani suffered the damages alleged in this Complaint, which include but are not limited to emotional distress, physical pain and suffering, mental anguish, and the loss of the ability to protect his legal rights and to function in society.

270.    As a result of the foregoing, Ahmed, through his Guardian, the Plaintiff, is entitled to recover compensatory and punitive damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**42 U.S.C. § 1981 – Violation of Equal Rights**
**Racial Discrimination**
**(Against Individual Defendants)**

271.    On behalf of Ahmed Ferhani, who is unable to protect his legal rights, Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

272.    42 U.S.C. § 1981 prohibits the denial of the full and equal benefit of all laws and proceedings for the security of persons based on race.

273.    The acts and conduct of Defendants complained of herein were motivated by racial animus and were intended to discriminate based on race.

274.    Defendants' denied Ahmed equal rights under the laws because of his race in violation of 42 U.S.C. § 1981.

275.    As a direct and proximate result of Defendants' conduct, Ahmed suffered the injuries and damages set forth above.

### FOURTH CLAIM FOR RELIEF
**42 U.S.C. § 1983 – Violation of Equal Protection**
**Racial Discrimination**
**(Against Individual Defendants)**

276.    On behalf of Ahmed Ferhani, who is unable to protect his legal rights, Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

277.    42 U.S.C. § 1983 prohibits the denial of the full and equal protection of all laws based on race.

278.    The acts and conduct of Defendants complained of herein were motivated by racial animus and were intended to discriminate based on race.

279.    Defendants' denied Ahmed equal protection under the laws because of his race in violation of 42 U.S.C. § 1981.

280.    As a direct and proximate result of Defendants' conduct, Ahmed suffered the injuries and damages set forth above.

### FIFTH CLAIM FOR RELIEF
### Title VI of the Civil Rights Act of 1964
### Racial Discrimination
### (Against Defendant DOCCS)

281.    On behalf of Ahmed Ferhani, who is unable to protect his legal rights, Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

282.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, prohibits discrimination based on race, color, and national origin in programs and activities receiving federal financial assistance.

283.    DOCCS is a recipient of federal funds and is subject to the mandate of Section 504.

284.    The acts and conduct of Defendants complained of herein were motivated by racial animus and were intended to discriminate based on race.

285.    Defendants committed the foregoing acts intentionally, willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifferent to the clear risk of death or serious injury to Ahmed that shocks the conscience. They are therefore also liable for punitive damages.

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants as follows:

(a)    That the Court issue an Order declaring that Defendants have acted in violation of the United States Constitution;

(b)    That the Court award compensatory damages to Plaintiff on behalf of Ahmed Ferhani, and against the Defendants, jointly and severally, in an amount to be determined at trial;

(c)    That the Court award punitive damages to Plaintiff on behalf of Ahmed Ferhani, and against all Individual Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

(d)    For a trial by jury;

(e)    For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

(f)    For any and all other relief to which he may be entitled.

Dated:    New York, New York
            April 15, 2022

/s/Marc A. Cannan
Marc A. Cannan (MC 0513)
BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, 26th Floor
New York, New York 10016
(212) 490-0400