UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

KHEIRA ZAHAF, as Legal Guardian of
AHMED FERHANI,

          Plaintiff,

     v.

NEW YORK DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, et al.,

          Defendants.

22-CV-291-LJV
DECISION & ORDER

---

On April 15, 2022, Kheira Zahaf, as legal guardian of her son, Ahmed Ferhani,

commenced this action under 42 U.S.C. sections 1981 and 1983 as well as Title VI of

the Civil Rights Act of 1964.  Docket Item 1 at 32-39.  The claims arise in connection

with the severe brain damage Ferhani allegedly suffered after he attempted to kill

himself while incarcerated at the Attica Correctional Facility ("Attica").  *Id.* at ¶ 23.  Zahaf

asserts claims of racial discrimination and deliberate indifference to Ferhani's known

risk of suicide.  *Id.* at 32-39.

Zahaf sued several defendants connected with the New York Department of

Corrections and Community Supervision ("DOCCS"): DOCCS itself; Anthony J.

Annucci, the Acting Commisioner of DOCCS; and Stephen J. Maher, the Chief of

Investigations for DOCCS.  She also sued several Attica officials and employees:

Superintendent Dale Artus, Deputy of Security Stewart T. Eckert, Supervisor Offender

Rehabilitation Coordinator Jeffery K. Schiffer, Deputy Superintendent of Programs

Leanne Latona, Corrections Officer Michael J. Diebel, and other "John and/or Jane Doe[]" corrections officers.  *Id.* at ¶¶ 13-21.

On October 6, 2022, the defendants moved to dismiss Zahaf's complaint, Docket Item 32; on December 8, 2022, Zahaf responded, Docket Item 38; and on December 22, 2022, the defendants replied, Docket Item 39.

For the following reasons, the defendants' motion to dismiss is denied.

## **FACTUAL ALLEGATIONS**[1]

Ferhani was born in Algeria in 1984 or 1985, Docket Item 1 at ¶¶ 23-24, and he "began suffering significant mental health problems in his early childhood," *id.* at ¶ 24. In 1994, Ferhani and his family moved to the United States.  *Id.* at ¶ 28.  In 2002, he was diagnosed with bipolar disorder*, id.* at ¶¶ 34-36, and between 2002 and 2006, he was hospitalized at least four times for harming or threatening to harm himself.  *Id.* at ¶¶ 34-35, 39, 41.

In 2008, Ferhani attempted to hang himself when he was incarcerated at "Rikers Island."  *Id.* at ¶ 43.  Ferhani was released, but he returned to Rikers Island in 2011 when he was arrested on conspiracy and weapons charges related to terrorism*, id.* at ¶ 57, and he was repeatedly placed on suicide watch, *id.* at ¶ 60.  Between November 2011 and January 2012, he ingested batteries, cut his neck, and tried to hang himself. *Id.* at ¶¶ 63, 65, 72.  Medical staff also noticed scars on his arms "from the elbow up." *Id.* at ¶ 66.

---

[1] On a motion to dismiss, the Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  The following facts are taken from Zahaf's complaint, Docket Item 1.

Because of his psychiatric issues, Ferhani was sometimes sent to Bellevue Hospital, where medical personnel noted that his bipolar disorder remained active, diagnosed him with adjustment disorder with depressed mood, and administered medication.  *Id.* at ¶¶ 68, 72-73.  When he was not hospitalized, Ferhani sometimes was placed in a mental health unit at Rikers Island due to his suicide risk and because of "a self-harm injury."  *Id.* at ¶¶ 74-76.

In December 2012, Ferhani pleaded guilty to the conspiracy and weapons charges.  *Id.* at ¶¶ 57, 77.  In March 2013, a licensed medical health counselor at Rikers Island diagnosed Ferhani with active adjustment disorder with mixed anxiety and depressed mood.  *Id.* at ¶ 78.  A few days later, he was sentenced to 10 years in prison. *Id.* at ¶ 79.  At sentencing, Ferhani's counsel asked that he be given mental health treatment when he entered the DOCCS system.  *Id.* at ¶ 82.  The sentencing court "directed that DOCCS be provided with a psychological evaluation" documenting Ferhani's mental health issues.  *Id.* at ¶ 83.

Ferhani was screened for intake into the DOCCS system.  *Id.* at ¶ 85.  The nurse who performed his health screening documented that he had a history of mental health treatment for psychosis and affective mood disorders; that he had been prescribed mental health medication, which he had a history of refusing to take; that he had attempted suicide; and that he currently complained about his mental health.  *Id.* at ¶ 86.  A New York State Office of Mental Health staff member[2] then "g[ave Ferhani] a

---

[2] The complaint refers to "OMH" several times, including by calling this person "an OMH staff member," without defining "OMH."  *See* Docket Item 1 at ¶ 87.  In a footnote, the complaint refers to "OMH," and the "New York State Office of Mental Health," *see id.* at ¶ 93 n.1, so this Court infers that "OMH" means the "New York State Office of Mental Health" throughout the complaint.

mental health screening" and documented Ferhani's history of suicidal behavior, as well as his hospitalizations for mental health treatment over the prior five years.  *Id.* at ¶¶ 87, 89.

A New York State Office of Mental Health psychologist also evaluated Ferhani and reviewed his file and paperwork from Rikers Island.  *Id.* at ¶¶ 90-91.  The psychologist learned that Ferhani had a history of significant mental health diagnoses, including bipolar disorder; had experienced childhood trauma; had been treated with a variety of psychiatric medications; had a history of self-harm and suicide attempts; and had recently been on suicide watch.  *Id.* at ¶¶ 92, 94, 98-99, 102-03.  Several of those factors are "significant risk factor[s] associated with suicide," and the psychologist documented that Ferhani had these risk factors.  *Id.* at ¶ 93, 95, 100, 104-05.

In August 2013, Ferhani was transferred to Great Meadow Correctional Facility, where he was harassed by corrections officers.  *Id.* at ¶ 112, 114.  For example, corrections officers called him a "dirty Arab," a "sand nigger," and a "terrorist."  *Id.* at ¶ 115.  One officer told him, "Don't blow nothing up motherfucker or I'll blow a hole in your ass."  *Id.* ¶ 122.  A group of officers surrounded him and said, "Terrorists don't last long here.  White power!"  *Id.* at ¶ 119.  Officers also groped and fondled him.  *Id.* at ¶ 117.

On August 21, 2014, Ferhani sent Acting Commissioner Annucci a letter stating that he was overwhelmed by the constant intimidation and harassment by officers at Great Meadow and that he "lived in constant fear of being hurt."  *Id.* at ¶ 120.  Two months later, Ferhani sent then United States Attorney General Eric Holder a letter, with a copy to Annucci, complaining about his treatment at Great Meadow and stating that

he wanted to "remain alive and productive until [his] release." *Id.* at ¶¶ 126-27 (alteration in original). The Assistant Commissioner of DOCCS responded that the allegations lacked support and that Ferhani should direct his concerns to officials at Great Meadow. *Id.* at ¶ 128.

On March 24, 2015, Ferhani was assaulted at Great Meadow. *Id.* at ¶ 130. He suffered injuries including a laceration on his head that required 12 staples. *Id.* at ¶ 133.

After the assault, Ferhani filed grievances about his experiences at Great Meadow. *Id.* at ¶¶ 145, 150-51, 154. He said that officers "constant[ly] threat[ed] and intimidat[ed]" him and denied him showers, food, recreation, legal services, medical attention, and mental health services. *Id.* He was extremely depressed, was "not in a stable state of mind," and needed to speak to someone immediately. *Id.* at ¶¶ 151-52. But no one responded to Ferhani's grievances. *Id.* at ¶¶ 149, 153, 157.

On May 28, 2015, after an attorney wrote to the superintendent of Great Meadow requesting Ferhani's transfer "due to the imminent risk of serious harm [that] he faces," Ferhani was transferred to Attica. *Id.* at ¶¶ 165, 169. But things did not improve there. *E.g.*, *id.* at ¶¶ 173-76.

In fact, corrections officers at Attica, including Diebel and the Doe corrections officers, continuously harassed and intimidated Ferhani. *Id.* at ¶ 173. They said such things as, "Fucking ISIS," "Keep thinking you're good here," and "Kill yourself, bitch." *Id.* at ¶ 174. One officer, whom the complaint does not name, asked Ferhani, "How does an ISIS member get a white girl like that," referring to Ferhani's fiancé. *Id.* at ¶ 175.

Ferhani was placed on "A Block," where a corrections officer repeatedly threatened to kill him. *Id.* at ¶ 176. Ferhani later was moved to a different cell block, but the officer continued to threaten him. *Id.* at ¶ 177. On February 28, 2016, Ferhani was moved back to A Block, where the harassment and intimidation persisted. *Id.* at ¶¶ 178, 194. For example, Diebel and the Doe corrections officers threw feces and bacon into his cell. *Id.* at ¶¶ 195-96.

Ferhani wrote to Eckert, Attica's Deputy Superintendent of Security, "regarding the harassment and threats [that] he was receiving from correctional officers and asked why he had been returned to A Block." *Id.* at ¶¶ 182, 197. Eckert responded on March 1, 2016, saying that Ferhani's housing was correct. *Id.* at ¶ 200. Eckert neither investigated nor addressed Ferhani's complaints about the officers. *Id.* at ¶¶ 199, 201.

Ferhani also asked to be assigned to a vocational trade, but Schiffer, the Supervisor Offender Rehabilitation Coordinator, said that he could not help Ferhani because Ferhani might "make a bomb." *Id.* at ¶¶ 179-80. Schiffer also questioned Ferhani about why he "wanted to be a Muslim and starve himself." *Id.* at ¶ 181. Schiffer then called Eckert, the two men made jokes "at [Ferhani's] expense," and Eckert told Schiffer to keep Ferhani idle rather than give him vocational training. *Id.* at ¶¶ 182-83.

In March 2016, Ferhani wrote then United States Attorney General Loretta Lynch a letter stating that he suffered "constant threats, harassment, name calling, [and] retaliation" at Attica. *Id.* at ¶¶ 205-07 (alteration in original). He told Lynch that he was "emotionally and mentally drained due to the constant oppression and hatred [that he] face[d] and endure[d] every day." *Id.* at ¶ 208. And he said that his "mental health

6

diagnosis [was] difficult to manage . . .  [and that it was] even more difficult to manage in such a cruel and wicked environment that ha[d] been dedicated to destroying rather than helping" him.  *Id.* at ¶ 209.

Ferhani also told Lynch that although he was not suicidal when he wrote the letter, he recently had been suicidal and close to taking his own life.  *Id.* at ¶¶ 211-12. He said that he believed that the officers' actions could make him suicidal again.  *Id.* at ¶ 212.  In fact, he said, he "fully expect[ed]" retaliation by the officers and that he "would" kill himself the next time officers or their superiors "violated" him.  *Id.* at ¶¶ 213, 215.  He concluded that "[i]f taking my own life is the only way to expose the evils that are practiced daily by corrections officers[,] then I will be glad to do it."  *Id.* at ¶ 216.

Ferhani copied Annucci and Artus on the letter, and by about April 4, 2016, Annucci, Artus, Eckert, Schiffer, and Latona had "received a copy of, or were made aware of," this letter.  *Id.* at ¶¶ 205, 217.  In fact, they read the letter and "recognized that it threatened self-harm and suicide, as well as chronicl[ed] numerous other factors indicating that [Ferhani] was at great risk of self-harm or suicidal behavior."  *Id.* at ¶ 218. Maher, Diebel, and the Doe corrections officers also were aware of the letter at about the same time.  *Id.* at ¶¶ 250-51.

Nevertheless, corrections officers continued to harass, bully, and threaten Ferhani.  *Id.* at ¶ 221.  Indeed, Diebel and the Doe corrections officers "encouraged [Ferhani] to kill himself and told him 'to die.'"  *Id.* at ¶ 223.  On April 6, 2016, Artus's

office received a letter from Ferhani saying that he had reached his "emotional and psychological limit" and intended to kill himself.[3]  *Id.* at ¶¶ 224-25.

At about 11:30 a.m. on April 6, 2016, Ferhani tried to hang himself.  *Id.* at ¶ 226. He survived, but he sustained brain damage and other severe injuries.  *Id.* at ¶ 238.  In May 2019, Ferhani was granted medical parole and discharged to a nursing home.  *Id.* at ¶ 245.  In November 2019, Zahaf was appointed Ferhani's legal guardian, *id.* at ¶ 12, and in May 2020, Ferhani moved in with Zahaf, who continues to care for him at her home, *id.* at ¶¶ 246-47.

Zahaf's complaint includes five claims: (1) deliberate indifference to a known risk of suicide in violation of the Eighth Amendment under 42 U.S.C. section 1983, (2) supervisory liability in violation of the Eighth Amendment under 42 U.S.C. section 1983, (3) racial discrimination in violation of equal rights under 42 U.S.C. section 1981, (4) racial discrimination in violation of equal protection under 42 U.S.C. section 1983, and (5) racial discrimination in violation of Title VI of the Civil Rights Act of 1964 against DOCCS.  Docket Item 1 at 32-38.

Zahaf has sued all defendants in their individual capacities.  *Id.* at ¶ 22.  The complaint says that the first, third, and fourth claims are "[a]gainst [i]ndividual [d]efendants," without specifying whether the claims are against some or all of the individual defendants.  *See id.* at 32, 37.  According to Zahaf's response to the motion to dismiss, however, the first claim is made against all individual defendants: Annucci, Artus, Eckert, Maher, Schiffer, Latona, Diebel, and the Doe corrections officers.  *See* Docket Item 38 at 17-28.  On the other hand, the response says that the third and fourth

---

[3] Ferhani does not allege the specific time on April 6 when Artus received the letter.

claims—alleging racial discrimination—are brought against only three individual defendants: Eckert, Schiffer, and Diebel.  *See id.* (describing allegations of racial discrimination against these defendants and stating that there is a "single claim"—deliberate indifference—against each of the other individual defendants).

## LEGAL PRINCIPLES

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

## DISCUSSION

After the defendants moved to dismiss the complaint, Docket Item 32, Zahaf voluntarily dismissed her second claim, Docket Item 38 at 14-15 n.3.[4]  She also said that she intends to amend her complaint to add a claim "of policymaker liability" against certain defendants*, id.*, but she has not yet moved to do so and more than a year has

---

[4] Page numbers in docket citations refer to ECF pagination.

passed since she filed her response.  The Court therefore considers the motion to dismiss as to claims one, three, four, and five.[5]

## I.    SECTION 1983 DELIBERATE INDIFFERENCE CLAIM

The defendants first argue that Ferhani's risk of suicide was not serious enough to be the basis of a claim of deliberate indifference, *see* Docket Item 39 at 5, and that even if it were, the individual defendants were not involved personally, Docket Item 32-1 at 14-19.  This Court disagrees.

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States."  *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997).  "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

To establish the liability of a government official under section 1983, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).  It is not enough to assert that the defendant is a "link[] in the prison['s] chain of command."  *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004).  Moreover, the theory of respondeat superior is not

---

[5] The defendants raised a statute of limitations ground for dismissal, Docket Item 32-1 at 10-12, but then conceded that the facts alleged were "sufficient to withstand dismissal," Docket Item 39 at 2-3.  Therefore, the Court does not address this issue.

available in a section 1983 action.  *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).  Instead, "[t]he violation must be established against the supervisory official directly."  *Tangreti*, 983 F.3d at 618.

Zahaf analyzes her claim of deliberate indifference to a known suicide risk as a claim for inadequate medical care, Docket Item 38 at 15-16 and n.4, while the defendants analyze it as a claim for failure to protect, Docket Item 32-1 at 13.  At its core, a claim that those responsible for someone's care failed to monitor a suicide risk raises issues related to medical care, and most courts in the Second Circuit have analyzed such claims under the framework of inadequate medical care.  *E.g.*, *Jean v. Barber*, 2011 WL 2975218, at *4-5 (N.D.N.Y. July 21, 2011); *Diaz v. Smith*, 2022 WL 17752358, at *4 (N.D.N.Y. Dec. 19, 2022); *Estate of King by and through King v. Annucci*, 693 F. Supp. 3d 310, 324-25 (N.D.N.Y. 2023); *Bell v. Gillani*, 2013 WL 5304188, at *10 n.14 (N.D.N.Y. Sept. 19, 2013) (analyzing under inadequate medical care, but acknowledging that the analysis "is the same" for failure to protect); *see also Kelsey v. City of New* York, 2006 WL 3725543, at *4 n.5 (E.D.N.Y. Dec. 18, 2006) ("The bulk of cases dealing with the right of a person in custody for protection from suicide analyze the issue as an Eighth Amendment claim dealing with the inadequate provision of medical care.").  Therefore, this Court follows those authorities and analyzes this claim as one for inadequate medical care.

Inadequate medical care of a prisoner rises to the level of an Eighth Amendment violation only if a defendant, through acts or omissions, is "deliberate[ly] indifferen[t]" to the plaintiff's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

"The standard of deliberate indifference includes both subjective and objective components."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

Objectively, the plaintiff's medical needs must be sufficiently serious such that "the failure to treat [the] prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain."  *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Chance*, 143 F.3d at 702).  Courts consider such factors as "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."  *Chance*, 143 F.3d at 702 (alterations, citation, and internal quotation marks omitted).

Subjectively, the plaintiff must prove that the defendant knew about and disregarded the plaintiff's serious medical need.  *See id.* at 703.  The defendant must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and must draw that inference.  *Id.* at 702 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  But awareness may be inferred from circumstantial evidence, including evidence that the risk was obvious.  *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002) (citing *Farmer*, 511 U.S. at 842).

### A.    Objective Seriousness

With little explanation, the defendants assert that "Ferhani's risk of suicide as presented by the facts plead[ed] was not serious enough to satisfy the objective prong of the Eighth Amendment analysis."  *See* Docket Item 39 at 5.  The defendants are dead wrong:  "[A]llegations of mental illness, especially when accompanied with suicidal

ideation, state a plausible claim that [the p]laintiff's mental health needs were sufficiently serious." *Loadholt v. Lape*, 2011 WL 1135934, at \*3 (N.D.N.Y. Mar. 3, 2011).

What is more, the complaint is replete with allegations about Ferhani's history of mental illness and persistent suicidal ideation.  He was diagnosed with psychiatric disorders in 2002, 2011, and 2013.  *Id.* at ¶¶ 34, 36, 65, 68, 78.  Between 2002 and 2006, he was hospitalized at least four times for harming or threatening to harm himself, *id.* at ¶¶ 34, 35, 39, 41; in 2008, he attempted to hang himself, *id.* at ¶ 43; and between 2011 and 2012, he ingested batteries, cut his neck, and tried to hang himself, *id.* at ¶¶ 63, 65, 72.  In March 2015, Ferhani described himself as mentally unstable.  *Id.* at ¶ 152.  In March 2016, he said that he recently had been suicidal and that he might well become suicidal again.  *Id.* at ¶¶ 211-12.  Indeed, all signs pointed toward a serious risk of suicide, a risk that was realized when he tried to hang himself in April 2016, *id.* at ¶ 226.  Plainly, Ferhani's risk of suicide was sufficiently serious.

### B.      Subjective Deliberate Indifference and Personal Involvement

The defendants also say that Zahaf did not allege that the defendants were involved personally in any deliberate indifference.  Docket Item 32-1 at 14-19.  The Court addresses the claims against each defendant in turn.

### 1.      Annucci

The defendants argue that Annucci merely received the Lynch letter and that this is not enough to plead his personal involvement.  *Id.* at 14-15.  Generally, district courts have found that an official's failure to respond to an inmate's letters, by itself, is insufficient to establish personal involvement.  *See Franks v. Eckert*, 2020 WL 4194137, at \*7 (W.D.N.Y. July 21, 2020).  But "personal receipt of a complaint or letter and

subjective awareness of the alleged unconstitutional conditions may be one factor that helps establish personal involvement." *Eldridge v. Williams*, 2013 WL 4005499, at *5 (S.D.N.Y. July 30, 2013). As the Second Circuit has explained, a plaintiff "would be entitled to have the court draw the reasonable inference—if his [] complaint contained factual allegations indicating that [a l]etter was sent to the [the prison official] at an appropriate address and by appropriate means—that the [prison official] in fact received the [l]etter, read it, and thereby became aware of the alleged conditions of which [the plaintiff] complained." *Grullon v. City of New Haven*, 720 F.3d 133, 140-41 (2d Cir. 2013).[6]

Annucci's involvement includes and far exceeds his receipt of the Lynch letter. Indeed, Annucci received other letters from Ferhani, including the 2014 letters in which Ferhani said that he was overwhelmed by the constant intimidation and harassment by officers at Great Meadow and that he wanted to "remain alive." *Id.* at ¶¶ 120, 126-27. Zahaf alleges that Annucci himself knew about Ferhani's history of mental illness. *Id.* at ¶ 252. In fact, Ferhani's history, including many incidents of self-harm and attempted suicide while in custody, was documented in DOCCS records, and so Zahaf has plausibly pleaded that Annucci personally knew of this history. *See id.* at ¶¶ 83, 86, 91, 105.

Furthermore, Zahaf alleges that Annucci received a copy of the Lynch letter, and actually read the letter, days before Ferhani attempted to hang himself. *Id.* at ¶ 217-18.

---

[6] Neither side cites *Grullon*. The defendants do not raise the issue of whether Zahaf needed to allege that Ferhani sent his letters to the appropriate address and by appropriate means. The fact that Ferhani received responses to one letter that he sent to Annucci, Docket Item 1 at ¶¶ 126, 128, and to another letter that he sent to Eckert, *id.* at ¶ 200, support an inference that Ferhani addressed his correspondence correctly.

In that letter, Ferhani said that he had been suicidal recently, that officers were harassing him, and that he might become suicidal again.  *Id.* at ¶¶ 211-12.  Indeed, he said that he "would" kill himself the next time he was "violated."  *Id.* at ¶ 215.  Based on all that, Zahaf says, Annucci "inferred that there was a substantial risk of serious harm to [Ferhani]'s health and safety and that he was, in fact, suicidal," *id.* at ¶ 253, but did nothing to mitigate the risk of suicide, *id.* at ¶ 254.  At least at this early stage of the case, Zahaf has adequately pleaded Annucci's personal involvement.

The defendants also claim that contents of the Lynch letter, as alleged in the complaint, were not enough to put any individual prison official on notice of a substantial risk of suicide.  Docket Item 32-1 at 15.  But that is simply not so:  Ferhani's statements about his recent suicidal ideation and his likelihood of becoming suicidal again were plain, resolute, and more than enough to put anyone who read them on notice of Ferhani's substantial risk of suicide.

The defendants suggest that because Annucci oversees an agency with thousands of inmates, the Lynch letter could not have put him on notice.  *See id.*  But as Zahaf correctly notes, "[b]y that logic, the DOCCS Commissioner would never be under any obligation to protect the health and wellbeing of any person placed under his care and custody."  Docket Item 38 at 21.  This Court agrees that the existence of many DOCCS inmates does not mean, as a matter of law, that Annucci never can be involved personally.  *See, e.g.*, *Pearson v. Annucci*, 2023 WL 2537722, at *8 (N.D.N.Y. Mar. 16, 2023) (denying motion to dismiss deliberate indifference claim against Acting Commissioner Annucci because, "[w]hile it appears improbable that Annucci was aware

of [the p]laintiff's written complaints, attempted suicide, or abuse at the hands of prison guards, it is not implausible.")

The motion to dismiss the deliberate indifference claim against Annucci therefore is denied.

### 2.   Artus

The complaint also alleges that Artus, the Superintendent of Attica, was involved personally.  He was "responsible for preventing inmate suicides at Attica by, *inter alia*, effectively monitoring inmates, understanding potential suicide indicators, and knowing the appropriate responses when it was determined that an inmate might be at risk for self-harm or suicide."  *Id.* at ¶ 15.  Like Annucci, he took no action to mitigate Ferhani's suicide risk despite knowing of Ferhani's documented history of mental illness and suicidal ideation, especially because he received and read the Lynch letter.  *Id.* at ¶¶ 217-18, 252, 254.

What is more, Artus's office received a letter on the very day of Ferhani's final suicide attempt explicitly advising that Ferhani had reached his "emotional and psychological limit" and intended to kill himself.  *Id.* at ¶¶ 224-25.  The defendants contend that Artus did not receive the final letter in time to act, Docket Item 32-1 at 16-17, and that may be so; at this stage, however, the Court cannot resolve the factual issue of when Artus received the letter, nor can it determine whether he had enough time to act.  *Cf. Stubbs v. Dudley*, 849 F.2d 83, 84, 86-87 (2d Cir. 1988) (explaining that a jury could reasonably have found that a corrections officer was deliberately indifferent when he saw a group of inmates chasing another inmate and did not open a door to protect him).

For those reasons, Zahaf has adequately pleaded Artus's personal involvement. The motion to dismiss the deliberate indifference claim against him therefore is denied.

### 3.    Eckert

Likewise, the complaint alleges that Eckert, the Deputy of Security at Attica, was involved personally.  He was "responsible for preventing inmate suicides by, *inter alia*, effectively monitoring inmates, understanding potential suicide indicators, and knowing the appropriate responses when it was determined that an inmate might be at risk for self-harm or suicide."  Docket Item 1 at ¶ 16.  Like Annucci and Artus, he did nothing to mitigate Ferhani's suicide risk despite knowing about Ferhani's documented history of mental illness and suicidal ideation, and despite receiving and reading the Lynch letter and the explicit threats it included.  *Id.* at ¶¶ 217-18, 252, 254.

Moreover, about five weeks before Ferhani tried to hang himself, Eckert had received a letter from Ferhani "regarding the harassment and threats [that Ferhani] was receiving from correctional officers."  *Id.* at ¶¶ 194-97.  Ferhani wrote that the harassing conduct included having feces and bacon thrown in his cell.  *Id.* at ¶¶ 195-96.  Eckert responded to Ferhani's letter without addressing the complaints of harassment and threats from officers.  *Id.* at ¶¶ 199-201.  In other words, Eckert received Ferhani's letter, read it, responded to it, and had the authority to address the harassment, but he did nothing.

At this stage of the litigation, Zahaf has adequately alleged Eckert's personal involvement.  The motion to dismiss the deliberate indifference claim against him therefore is denied.

### 4. Maher, Schiffer, and Latona

The complaint alleges that Maher, the Chief of Investigations for DOCCS; Schiffer, the Supervisor Offender Rehabilitation Coordinator at Attica; and Latona, the Deputy Superintendent of Programs at Attica, were involved personally as well. *Id.* at ¶¶ 17, 18, 19. Each of their responsibilities included "preventing inmate suicides by, *inter alia*, effectively monitoring inmates, understanding potential suicide indicators, and knowing the appropriate responses when it was determined that an inmate might be at risk for self-harm or suicide." *Id.* Like the other defendants, they took no action to mitigate Ferhani's suicide risk despite knowing of his documented history of mental illness and suicidal ideation and despite receiving the Lynch letter. *Id.* at ¶¶ 217-18, 250-51, 254.

Again, at least at this early stage of the litigation, Zahaf has adequately pleaded Maher's, Schiffer's, and Latona's personal involvement. The motion to dismiss the deliberate indifference claim against them therefore is denied.

### 5. Diebel and the Doe Corrections Officers

Finally, the complaint alleges that Diebel and the Doe corrections officers were involved personally. Their responsibilities included "preventing inmate suicides by, *inter alia*, effectively monitoring inmates, understanding potential suicide indicators, and knowing the appropriate responses when it was determined that an inmate might be at risk for self-harm or suicide." *Id.* at ¶ 21. Despite knowing about Ferhani's documented history of mental illness and suicidal ideation, Diebel and the Doe corrections officers not only failed to mitigate that risk, but they also harassed him and exacerbated the risk. *Id.* at ¶¶ 21, 252, 254. They said such things as "Fucking ISIS," "Keep thinking you're

good here," and "Kill yourself, bitch."  *Id.* at ¶¶ 173-74.  They "encouraged [Ferhani] to

kill himself and told him 'to die.'"  *Id.* at ¶ 223.  Zahaf most certainly has alleged the

personal involvement of Diebel and the Doe corrections officers.

## II.    RACIAL DISCRIMINATION CLAIMS

The defendants say that Zahaf's section 1983 equal protection claims and

section 1981 claims fail because she did not allege Ferhani's race nor did she allege

any facts supporting the claim that the defendants were motivated by race.  Docket Item

32-1 at 20.  They also argue that Zahaf failed to plead that Ferhani was treated

differently than similarly situated inmates based on his race or religion and failed to

allege each defendant's personal involvement as required in an equal protection claim.

*See id.* at 16.  And the defendants say that the Title VI claims are meritless because

Zahaf did not allege facts "suggesting that any of the supervisory [d]efendants were

aware of racially discriminatory treatment of [Ferhani] while he was at Attica, let alone

that they failed to adequately respond to it."  *Id.* at 22.

"The Equal Protection Clause of the Fourteenth Amendment requires that all

persons similarly situated be treated in the same manner."  *Allen v. Cuomo*, 100 F.3d

253, 260 (2d Cir. 1996) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432,

439 (1985)).  Section 1981 provides, among other things, that "[a]ll persons within the

jurisdiction of the United States shall have the same right in every State and Territory

. . . to the full and equal benefit of all laws and proceedings for the security of persons

and property as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  And Title VI

provides that "[n]o person in the United States shall, on the ground of race, color, or

national origin, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial

assistance." 42 U.S.C. § 2000d.  Under section 1981 and Title VI, a plaintiff must show

that the defendant intentionally discriminated against him on the basis of race and that

discrimination was a substantial or motivating factor for the defendant's actions. *Tolbert*

*v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001).

      The defendants' argument that Zahaf did not allege Ferhani's race is unavailing

because the complaint clearly implies that Ferhani was Middle Eastern. *See Trs. of*

*Upstate N.Y. Eng'rs Pension Fund.,* 843 F.3d at 566 (explaining that on motion to

dismiss, the court "draw[s] all reasonable inferences in favor of the plaintiff"); *see*

Docket Item 38 at 24 n.10 (Zahaf stating that "[t]he clear inference . . . is that [Ferhani]

is Arab, which he is.").  Zahaf alleges that Ferhani was born in Algeria, had been teased

when he was young about not speaking English and about his "Muslim name," and was

called a "dirty Arab."  Docket Item 1 at ¶¶ 24, 29, 115.  So while the complaint may not

say so explicitly, it clearly suggests that Ferhani belongs to a minority group often

subject to harassment.

      The defendants may be correct that Zahaf did not allege that Ferhani was treated

differently than other similarly situated individuals, but that is not fatal to the equal

protection claim.  Typically, a plaintiff asserting an equal protection claim "must allege

that similarly situated persons have been treated differently," *see Gagliardi v. Village of*

*Pawling*, 18 F.3d 188, 193 (2d Cir. 1994), but allegations about comparators are not

necessary when there is direct evidence of intentional discrimination, *see Pyke v.*

*Cuomo*, 258 F.3d 107, 108-10 (2d Cir. 2001).  A plaintiff may allege that defendants

intentionally hurt him for racial reasons, that "a facially neutral law or policy has been

applied in an intentionally discriminatory race-based manner, or that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus." *Id.*; *see Ali v. Connick*, 136 F. Supp. 3d 270, 280 (E.D.N.Y. 2015) (explaining that "officers' use of racial epithets may be regarded as direct evidence of racial animus and, when combined with physical abuse or other unlawful actions, may establish an equal protection violation") (collecting cases); *Baskerville v. Goord*, 1998 WL 778396, at *7 (S.D.N.Y. Nov. 5, 1998) ("Where [statements reflecting racial prejudice] are shown to be connected with physical injury, a [section] 1983 claim may indeed lie"); *Vilkhu v. City of New York*, 2008 WL 1991099, *5 (E.D.N.Y. May 5, 2008) (explaining that plaintiff did not need to compare himself to a similarly situated group because he alleged that officers "used an express racial classification" when they singled him out for his ethnic origin and applied a neutral policy of detaining people in an intentionally discriminatory manner).  And because Zahaf has plausibly pleaded direct evidence of intentional discrimination, allegations about a comparator are unnecessary.

As to Eckert and Schiffer, Zahaf says that they denied Ferhani vocational training on the basis of race.  Docket Item 38 at 23-26.  Schiffer questioned Ferhani about why he "wanted to be a Muslim and starve himself" and said that he could not help Ferhani obtain vocational training because he might "make a bomb."  Docket Item 1 at ¶ 180-81. Schiffer then called Eckert, the two men made jokes at Ferhani's expense, and Eckert told Schiffer to keep Ferhani idle rather than give him vocational training.  *Id.* at ¶¶ 182-83.  Given the direct comments about Ferhani's race in connection with the denial of vocational training, Zahaf has sufficiently pleaded that Eckert and Schiffer applied the

policy of placing inmates in vocational programs in an intentionally discriminatory race-based manner.

For similar reasons, Zahaf also has plausibly pleaded personal race-based discrimination on the part of Diebel and the Doe corrections officers.  Zahaf alleged that they called Ferhani "Fucking ISIS," threw bacon into his cell, and asked how he "g[o]t a white girl."  ¶¶ 173-75, 195-96.  Knowing about Ferhani's suicidal ideation, they encouraged him to kill himself, *id.* at ¶ 223, advice that he unfortunately followed, *id.* at ¶ 226.[7]  Zahaf therefore has adequately alleged that Diebel and the Doe corrections officers were involved personally and that they intentionally discriminated against Ferhani based on his race.

As for the Title VI claim, Zahaf again has pleaded facts plausibly suggesting that most of the supervisory defendants—Annucci, Artus, Eckert, Schiffer, and Latona—were aware of Ferhani's racially discriminatory treatment and failed to respond.  Zahaf alleged that the supervisors did nothing after receiving and reading the Lynch letter, which included Ferhani's complaints about racial threats, harassment, and name calling, *id.* at ¶¶ 205, 207, 217-18; she also alleged that supervisors Eckert and Schiffer themselves denied Ferhani vocational training based on his race, *id.* at ¶¶ 181-83.  Those allegations are sufficient to support the Title VI claim.

---

[7] Although less direct than a physical assault, the correctional officers' encouragement of Ferhani to commit suicide was "connected with [Ferhani's] physical injury."  *See Baskerville*, 1998 WL 778396, at *7.  When the risk of self-harm is high, as it was here, such encouragement can be nearly as severe as the "physical abuse" that the court found sufficient to support an equal protection claim in *Ali*, 136 F. Supp. 3d at 280-81.  *Cf. Lisle v. Welborn*, 933 F.3d 705, 718 (7th Cir. 2019) (explaining in Eighth Amendment context that encouraging suicidal inmate to commit suicide can cause psychological pain); *Beal v. Foster*, 803 F.3d 356, 357 (7th Cir. 2015) (explaining in Eighth Amendment context that "attempt[ing] to draw a categorical distinction between verbal and physical harassment is arbitrary").

22

**<u>CONCLUSION</u>**

For the foregoing reasons, this Court DENIES the defendants' motion to dismiss, Docket Item 32.


SO ORDERED.

Dated:   September 30, 2024
         Buffalo, New York


*<u>/s/ Lawrence J. Vilardo</u>*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE